Good morning. May it please the court. Ken Catanzari appearing for the appellants, American Pearl Grp and Sarkissian and his partner. With respect to this case, I think it's undisputed that we're looking at a statute that defines specifically how you calculate usurious interest. All interest at any time contracted for, charged, received, or in connection with the loan. Now, in the district court case, the trial judge determined that essentially he would rely upon very old cases, dealing for the most part with interest only loans, Nevels and its progeny, and he determined that he would not apply the statute. In other words, he did not apply the use of the actuarial method to determine whether or not the loan was usurious. In our pleading and the First Amendment complaint, we specified in Exhibits G and H precisely how the calculation would result, which showed that using the schedule, and I will point out that the schedule in this case attached to the loan, did not specify an interest rate. Instead, it specified payments denominated as principal and as interest, and the amounts increased over time, began at a lower rate and increased over time. That schedule was converted by the plaintiffs to a calculation set forth in Exhibit G attached to the complaint that determined that the rate, using the actuarial method, the rate of interest was 34.5% per annum, and therefore usurious. In the district court's determination, it used the Nevels methodology, and it took 28%, the commercial loan maximum, and it multiplied at times the original principal amount, before any amortization of principal over the 42 months of the loan, the three and a half years of the loan, took that amount and multiplied it by three and a half times to arrive at a total aggregate that was therefore greater than the amount of interest charged and scheduled on the loan, which was $309,000. But if you use the actuarial method and apply it in the same manner, then it's 34.5%, which is greater than the 28%. Counsel, this is one of these cases where we're making an eerie guess. I'm sorry? We're making an eerie guess, right? Yes, you're making an eerie guess. Not the best named legal doctrine in the world. I mean, we're not guessing, but we're kind of at the mercy of whatever the Texas courts have said. Has any Texas court interpreted or applied this particular section, 306.004A? None. Some of the bankruptcy courts, no Texas state court has. Some of the bankruptcy courts have applied, sometimes pre-petition, sometimes post-petition, the actuarial method in determining whether or not the loan contained a clause for usurious interest. However, I would point out with each of the cases, we went through the cases in our respective briefs, and I think the cases are all distinguishable. In other words, if you look at Neville's… What concerns me more is that are any of those cases even applying the statute? None of the cases cited applied the statute. It seems to me that the simpler version, the one that doesn't require higher math, which is just, you know, you multiply these three things. I think of that as the simpler version. That's what, what did you say, Neville's, Nevers? Neville's and his progeny were all simple. They're not applying the statute, are they? Well, it depends on one's interpretation. Neville's was an interest-only loan. Yeah. So if it's interest-only, you could apply the, quote, actuarial method, which it didn't apply, and you'd end up with the same result, whether or not it was usurious, because there had been no principal payments. In other words, the distinguishing factor between our case and some of the cases that are cited, most of the cases that are cited, are that they don't account for the payment of principal post-loan inception. And if you don't account for principal, then obviously, if it's interest-only loan, you aren't accounting for principal, so the result would be the same. So whether or not the district court could appropriately then just take Neville's and latch onto Neville's and say 28% times that number. Well, what I'm reacting to is that the statute says using the actual actuarial method during the stated term of the loan. And are you aware, I mean, of course, I could look this up, but do you know when this language came into the finance? 1999. 1999. You do know, thank you. So since then, do we have any Texas court that's sort of zeroing in on that language and saying, well, that means this. Well, there's no Texas court case that says this is how we interpret 306. None. And so we acknowledge that. However, it doesn't necessarily, it's not necessarily an unfriendly question. I mean, we're, as I see it, we have to act as if we were more or less a Texas intermediate court in a diversity case like this. And we're looking at sort of what do the Texas courts do? Except that the answer to that may well be that the statute is so obvious that there's not going to be a Texas court case that deals with these facts, which sets out a scheduled rate of principal and interest pay down. In other words, it's unambiguous. Everyone knows, you could just look in Black's Law or any other finance dictionary, how you calculate actuarial method. It involves a reduction over time of the principal payments on the loan. There's no mystery to that. It's quite easy to calculate. You put it in an Excel schedule, and the number comes out. So perhaps the answer is that the statute is obvious.  Therefore, where's the mystery? But I want to go to another issue that I think, not that I would depart from, the point that we believe you should reverse and allow us back to the trial court so that we can actually litigate the case. And I will say an important distinguishing factor in this case versus all the others is the option. It's undisputed that at the time the loan is entered into in May of 2019, where they're borrowing $375,000, with a schedule that I've identified and talked about under the schedule aspect, that as a condition to getting that loan, the borrower had to give up an option on its portfolio that existed. They had 350 merchants generating $30,000 a month. And they could, that option entitled the lender to select 20,000 roughly per month of residuals at any time between the initial inception of the loan and the 42 months, the end of the loan. And we say, and we pled, specifically in the First Amendment complaint, in paragraph 77 and 78, which the district court acknowledges in its opinion, acknowledges that we specified that there was a market of 40 times that residual, 20,000 or roughly 800,000, that we alleged specifically that that was the market value of that portfolio. That asset, which was existing, had been a two-year-old portfolio. It was existing, it was performing. And that that portfolio in the industry had a recognized market value of 40 times. Yet the option exercise was the equivalent of 2.35 times. So it is a classic way-in-the-money option to acquire that portfolio. In other words... The value of the portfolio does fluctuate over time, though, right? Yes, the portfolio could fluctuate over time. But that's not the evidentiary question. In other words, that argument would be made at the time of trial, or pursuant to summary judgment, that it was too uncertain. We had the opportunity to put on a trial that would show this is a dynamic industry, a multibillion-dollar industry. These portfolios are valued all the time. So there would be no mystery for the borrower to put on evidence at trial that expert testimony in addition to their testimony. Would you agree that if the value turned out as a factual matter to be uncertain, that it would not constitute interest? Well, I don't... It's not uncertainty. First of all, there's 350 members of that portfolio, not just one. Therefore, an argument of uncertainty would not apply because the experts would be able to quantify what percentage of that portfolio would attrit over time and what the value of that portfolio was based upon the historical operation of that portfolio pre-entering into the loan and post-entering into the loan. In other words, it's a matter of evidence as to what someone would have given you for that portfolio at the time the loan is entered into in May of 2019. That is a subject of evidence. The trial court set an impossible standard for the plaintiff. The trial court says, well, it's not certain. You can't establish the value for me. But you can establish a value through expert testimony as to what that portfolio would have traded for, much for the fact that it had to auction that portfolio to get the loan at a deep in the money option. Assuming that evidence was presented at trial, the jury could reject it or accept it or come somewhere in between. But for the trial judge to say, well, I'm not going to let you present any evidence on that point. And let me add, there are eight cases cited by the parties in this case. Of those eight, seven involve trial court decisions. In other words, this is the site even to the Beavers case and the other cases. These are all trial court cases where the evidence is put on. If the evidence is deemed insufficient at the time of trial, sure, that's a result. We did not get to present that. We had a judge who said his findings were rather remarkable in that he just said, well, let's see. He said it's impossible for the court to ascertain the true value to be received by the defendants. Impossible. Then he says, without a doubt, we have to make a determination. He further says that there has to be a value with certainty. Well, that's an evidentiary issue. In other words, that issue is, what would the evidence be at the time of trial? Or summary judgment? Cross motions for summary judgment as to whether or not the portfolio had a value that set out an amount, such a deep discounted purchase, that it was consistent with the Hawaii Supreme Court case we cite and the Florida Supreme Court case that we cite, where options are certain to be exercised, expected to be exercised, based upon the economic conditions, as the Florida court said. Based upon the economic conditions, is that option to be exercised? Does it have a value? Let me ask. I don't think it's mentioned in either of the briefs, but Texas Finance Code Section 302.001C states, to determine the interest rate of a loan under this subtitle, all interest at any time contracted for shall be aggregated and amortized using the actuarial method during the stated term of the loan. Does this provision help us at all in this case? It seems like it would support your argument, but I don't see that it's cited in support. It does. We do cite it. We do cite cases under that, and we do cite the Texas. We cite that case as consistent. I'm sorry, forgive me. That statute is consistent with our interpretation. We also cite some of the Texas Practice Act provisions, which describe the methodology associated with actuarial method. But I don't want to depart. The importance here is that the standards set by the district court is not a standard that we should have been held to. In other words, this is a 12B6 motion to dismiss. We're entitled. We're entitled to the inferences. We're entitled to our evidence being treated as true and correct for purposes of determining whether or not we've stated a claim. And the standards set out became impossible because, essentially, he bought into the arguments by the defense that, oh, it'll be attrition, or the portfolio may not exist over time. And we showed in reply that, and in our first amendment complaint, that that portfolio not only existed, it grew. It went from 30,000 to 50-some thousand a year later to 70-some thousand a year after that. These enhanced the value of the portfolio that existed as of May of 2019. Why? Because the defendants were given a look back. They could go back. Remember, we asserted in the complaint that that extant portfolio, as of May of 2019, in paragraph 77, that extant portfolio had a value of 40 times the 20,000 a month, roughly. That was the value under the market. If you add to that the fact that they get a look back to take three and a half years and a look back at how the portfolio is performing and then select out of the 20,000 a month sets of merchants out of 70-some thousand, now they've got an even greater probability. We have experts who will testify at trial as to the value of that portfolio and that look back option period over time. And I suggest to you that it was a question of fact and we were entitled to have that matter heard or at least a summary judgment with respect to whether or not it was usurious, particularly on the option exercise. Thank you. All right. Thank you, sir. You've reserved your rebuttal. All right. We'll hear from Mr. Kessler. Counsel says there should be a trial. Good morning, Your Honors. Peter Kessler for the appellees. May it please the Court. We agree that this case is largely about the interpretation of a usury statute in Texas and that you are required to make an eerie guess with respect to what that statute means. Our perspective is that it's a simple matter. It was a simple matter for the district court and it is a simple matter for you as well. The Texas Supreme Court in 1937 enunciated the spread test, and in 1999 that was codified in two sections, which this Court has mentioned, of the Texas Finance Code. There have been four decisions subsequent to that 1999 codification in the Texas Intermediate Appellate Courts. That's the last 25 years, and those four decisions have all embraced the spreading method that was originally set forth by the 1937 Texas Supreme Court Nellis case. So in our view, the district court got it right, and the district court actually had really no other alternative. I don't think it was even close for the district court. The district court was duty-bound to interpret the Texas Finance Code statutes as the intermediate courts had interpreted them over the last 25 years. So since the 1999 codification in 306.04, you're saying there are four cases from Texas? There are four cases cited in our briefing that engage in the issue. Just to refresh my recollection, are those Texas Intermediate Court cases or the Texas Supreme Court cases? They are Texas Intermediate Court cases. Okay, and do they cite 306.04? They cite the 302.01, which has the same exact relevant language. Okay. I guess what I struggle with is that you can look up what actuarial method means in the dictionary, and if you go through the calculations, it's a little bit different than the simple calculation that the Texas Supreme Court did back in the 30s. That's what I struggle with, quite honestly. It's like I understand what you're saying. I just don't understand. We have to give meaning to that language using the actuarial method, meaning the interest is going down, you're paying off some principal. I struggle with that, too. And here are the ways that I've resolved it. The first way I resolve it is to say, frankly, what I think is utterly irrelevant. What matters is what the Intermediate Appellate Courts of Texas seem to interpret that language to mean. And they have clearly, in the cases cited in our brief, stated, well, the 1999 laws codify the 1937 statute. So it doesn't matter what I think, and Your Honor, it doesn't matter what you think. It codifies what now? It codifies the Neville's test set forth by the Texas Supreme Court in 1937. That's answer number one. Answer number two is that that statute, when I read the phrasing that Your Honor refers to, and I'm a lawyer, I'm not an accountant, I'm not a grammarian, but when I read that phrasing, what I read it to say is, the interest rate is computed by amortizing or spreading. And I read that as being synonymous for the purposes of the statute. Again, I'm not a grammarian. That makes sense to me. That's what amortize means. Then when I get to the next clause, I read using the actuarial method as referencing amortizing or spreading, because what I read as being important within that clause, to be emphasized, is it shall be during the stated term of the loan. That is to say that when you are doing the amortizing or spreading method, you shall not, in a 10-year loan, you shall not do it, say, with respect to the first five years to determine if there has been an interest rate, and then the second five years. You shall do it across the entire term. And so, Pevelin's argument is creative, but I disagree. We disagree. The actuarial method is not a Black's Law Dictionary definition. It refers to the prior clauses. Well, I mean, I've got the definition here from Black's Law Dictionary, actually. Yes, sir. I mean, a means of determining the amount of interest on a loan by using the loan's annual percentage rate to separately calculate the finance charge for each payment period after crediting each payment, which is credited first to interest and then the principal. So, you know, as you pay, obviously, the principal is going down somewhat. Well, and so, Your Honor, and I have two responses to that, again. The first one is to, again, say that the Texas Appellate Intermediate Court read it differently from how you're reading it and different from how Pevelin is reading it. The second response I have is that before I even knew that you could look this up in Black's Law Dictionary, when I read this statute, my reading was, amortizing or spreading using said prior referred-to method during the stated term of the loan. Oh, well, it doesn't say that. Well, but it's not clear to me. It doesn't say using said stated prior method. Yes, Your Honor. It says using the actuarial method. Yes, Your Honor, but in my reading of it, that refers to the prior to the amortizing or spreading. And the emphasis of that clause is it actually shall be applied to the entire stated term of the loan. And the third response that I have for Your Honor is there is a vast opportunity for deviltry in adopting the reading. Deviltry? The term of art, Your Honor. In adopting the term of art that my creative, and I respect very much that my creative colleague has advocated for. And put differently, the beauty of the 1937 test set forth by the Texas Supreme Court is that everybody's on the same page about what it means. You don't need... Well, the math is simpler. The math is simple, and Your Honor, we lawyers are not petitions. You don't need reference to, you don't need a battle of the experts for every single time you're interrogating a loan. And what we are inviting in this circumstance, Your Honor, here's the point that I want to get to, is that under the Texas methodology set forth in 1937, codified in 99, as stated in the Cannon case in 2009, codified in 1999, a loan for $500,000 that is structured as interest-only payments and a balloon payment shall be treated the same way as a loan for $500,000 where, say, you're paying interest and principal all the way along, shall be treated the same way, Your Honor, as a loan for $500,000 where you pay the principal all the time. Just as a vaguely knowledgeable consumer, I don't like that balloon payment option, right? I want the first option. And my wife would let me take out that balloon money. I mean, now you're having fun with me, Your Honor. No, no, I'm serious. It's like even ignorant English majors like me know that balloon payment's a bad deal because the interest rate gets jacked up. And ignorant English majors like me know that as well. But, Your Honor, what we're inviting in the analysis that's set forth by Appellant is a circumstance where loans that actually in the aggregate are for the same exact amount of interest, if they're declared to be structured differently, will result in entirely different rates of what would constitute your jury's interest. Whereas in the position that was set forth by Texas in 1937 and appears to have been the law of the land for the last 85-odd years, there's no such issue. And I want to preserve in your minds the notion that how you structure a loan under Appellant's view of the world leads to wildly different outcomes. I want you to preserve that in your minds when we get to the question of whether an option in this instance actually should be used for the purposes of the usury calculation. And I can move on to that now, unless Your Honor has more questions about this topic. So Appellant also sets forth the proposition that the District Court got it wrong when it failed to consider or refused to consider that the option agreement that was entered separately should be used for the purposes of calculating usury interest. And I want to scream to the heavens that the District Court really got it right. They really got it right. In this circumstance, the appellee entered into an option agreement by which it paid some $16,300-odd for an option to be exercised some three and a half years later, possibly to be exercised some three and a half years later, with a default payment of roughly $32,000. You don't disagree that the option was in consideration for the loan, correct? I mean, it's clearly tied to the terms of the loan. And, Your Honor, it is in connection with the loan, certainly, Your Honor, but as the District Court said, there is a difference between an option where... There's a difference between a financial instrument that is tied to a loan where it is entirely speculative what the ultimate value of that will be versus whether it is merely contingent on the operation of some sort of precedent. But did the parties at the time of the loan realize that this value would hopefully increase, that that would be more reason to make the loan, that the value would increase and thus be more of interest to the lender in the event of default? Right. And, Your Honor, and here's a danger zone. What that would ultimately be worth, under the best-case scenario and under the worst-case scenario, is entirely speculative. There is no telling if this business would even be a going concern, if the portfolio of merchants would have entirely attrited. I do do litigation in this area a fair amount. Sometimes merchant portfolios attrit at a rate of, say, 10% a year.  It depends a lot on what is in the portfolio. Is it livery? Is it like cab drivers? What happens when Uber comes in? Is it restaurants? What happens when COVID happens? Is it Walmart? That is a plum... That would be a plum merchant for a portfolio. And these values vary widely. Customer service matters greatly for whether merchants attrit from a portfolio or not. If you have good customer service, well, you're probably going to retain your merchants. If you have awful customer service, it's going to disappear. It's going to vanish. The value of this option was really speculative. And here we get into the danger area, Your Honors, because what we're talking about now, what Apellon is advocating for now, is that in circumstances where you have loans being made and you also have investments that coincide with those loans, Appellant is inviting this court and judges to act as private equity cops. Is the rate of return too high? In Appellant's world, in Appellant's advocacy, if you find an option or an investment, and under Texas law, the rate of return exceeds 28%. There is no telling how many creative lawyers will run with that and say, well, there's a loan component to it. Usually, bang, we're going to undo this entire transaction. That is what Appellant is advocating here. And the district court was sensitive to that. You'll see the district court, I don't think the district court touches on it in its opinion with respect to the motion for reconsideration, but it does touch on it in its original opinion dismissing the complaint. And the quote is from the district court, requiring certainty of interest, which we don't have here, guards against usury law inadvertently punishing mere business investments which facilitate socially desirable economic development and would be disincentivized if the possibility of substantial returns rendered investors subject to penalties. And so, your honors, you are being invited to go down a path which is at odds with the way business investment works in our country. I'll take questions on that. Is there... I note your argument is the law spins from 1937 and continually, but is there room for a certified question to the Texas Supreme Court? Or would your response be just read the intermediate cases? Well, your honor, I don't know that that's necessary. I mean, it's... It... Your honor, I just don't know if that's necessary. I'm not urging it is. I'm just asking it as a question. In eerie cases, we frequently get this. Sometimes when there are cases or whatever, I'm not suggesting at all. It's just a question because we have you both here. Yes, your honor. Our perspective is that the Texas Supreme Court actually spoke in 1937. It set forth a metric that is easily applied and has been applied for some 85-odd years. That that was codified in 1999. And according to subsequent intermediate appellate court decisions in Texas, that that codification... That was indeed a codification, the 1999 of Nevels. And there's been no contrary authority since. There you are. So I don't know that it's even an eerie guess. I mean, I think it's a... You're just enforcing the law that was set forth by the Texas Supreme Court in 1937 as codified in 1999. Such codification recognized in four subsequent intermediate appellate court cases. Well, counsel made a somewhat vigorous argument that, putting aside for a moment that question, that at a minimum there are some fact issues that needed to be tried either in the summary judgment context or otherwise. What's your response to that? Your Honor, if by definition... As a legal matter, by definition, the district court found that as a legal matter, by definition, there have been no... There's just no cognizable claim stated that the law, under no version of the world, as presented in the pleadings, could there actually be use rate under the circumstances. And the district court was... Also found that under no version of the world could an option agreement where 16,000 had been punked down at the outset, the option was to be exercised in three and a half years, there's no telling... There actually really is no certainty what the option would be worth. And there's a vision of the world where the option would be worth nothing at all. That that itself also, just under circumstances, could never give rise to a cognizable claim. I... I've got three minutes, but I don't want to just spend it yammering unless there are any more questions. Nope, don't work that way. No, it's fine. It's your time. If you feel like you've ably presented, there's no penalty to leaving time on the clock. Okay, well, I've said my piece, so thank you very much, Your Honor. All right, we appreciate it. No harm in asking, Counsel, but you've got exactly what you reserved. I know, I noticed that. Okay, look, what would be the purpose? If Neville's was the law of the land in Texas, that you don't count principal payments after the loan is made to determine whether or not something is usurious, then there'd be no purpose for the statute in the first place in 1999. And my colleague actually gave us an example that we could work with, right? I mean, he actually said from the podium that somehow the statute codified Neville's, meaning that for determining whether or not interest was usurious using the actuarial method, that there would be no difference between a loan, for example, that began with a balance of $500,000 and 3 1⁄2 years later still had a balance of $500,000 due because it was an interest-only loan compared to another loan where there was principal interest payments over the 3 1⁄2 years. Example, you borrow $500,000 and the requirement is six months later you repay $400,000. And then you amortize the balance of $100,000. Those two transactions are materially different. The latter transaction certainly results in usurious interest when you apply the fact that you paid down such a massive amount of principal six months later. That's precisely what happened here. Now, yes, is it an eerie yes? Well, first of all, the cases do not support his position. Neville's was interest-only. Perry is interest-only. Armstrong is interest-only. CK Investments, interest-only. Tanner was a 1973 loan interpreting a statute that talked about amortization over equal parts, not actuarial method. Essentially, all of the cases cited, there's not a case that actually deals precisely with the facts before us. Therefore, it's not an eerie guess to say that how this should be applied is consistent with the unambiguous statute. You can look up what it is. It's precise. It can be calculated. In fact, when I was reading these cases, I hearkened back to my years when I was a finance major, and I had to assemble a lot of money to buy a four-function calculator. And that was in 1937. They didn't have four-function calculators. They had a piece of paper and a pencil. That's it. And that's why the calculations were much simpler then, because you didn't want to complicate things by requiring something more. But I wanted to deal with this codification argument. And I think you must reject that argument. It makes no sense. And the statute can be interpreted by statutory construction. Is the phrase actuarial method rendered superfluous? Is it rendered red out of the statute because of the codification argument? Of course. It would have no purpose of even being the argument, and you can't do that as a matter of statutory interpretation. You must interpret the statute consistent with the meaning intended by the legislature. Then he talks about this vast confusion that could result. Make no mistake. The credit card industry, the payments industry, is a billion-dollar industry. MasterCard, Discover, all these portfolios are traded at these levels, the littlest levels, throughout the years. There's nothing ambiguous about this. That portfolio could be what is susceptible to valuation as of the date of the loan. And yes, it was a condition of the loan that if you want this loan, you've got to give us an option on this chunk of your portfolio. So it's a required condition. And the telling fact of this is that there was no effort to value it. They all knew what it was, what they were trading as part of the additional consideration for the loan. They all knew that the market value was 40 times, but they traded it 2.35 times because they were desperate to get the loan. They took advantage of them. They called the line of credit. They forced them into a situation where they had to borrow the money. Then they twisted their tail even more to require them to give up this rather significant, deep, deep, deep-in-the-money option. That is additional interest. The circuit court, the district court got it wrong when it said that, oh, you've got to give us certainty, Mr. Cotantri. You've got to give us a value, Mr. Cotantri. That is all subject to trial. We will have that evidence at trial. We will demonstrate that, even considering the statute and the interpretation of the Nevels, that this loan, with that exercised option, was usurious at the tune of 55%, well in excess of the 28%. And thank you very much. All right. Thank you, counsel, from both sides, for your argument and briefing. Before we take the last two cases, the panel will stand and recess for about 10 minutes.